# FOR PUBLICATION



**FILED**
Jul 30 2014, 9:47 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STACY L. HANEFELD**
**KATHRYN ELIAS CORDELL**
Hall, Render, Killian, Heath & Lyman, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**GLORIA J. DANIELSON**
Danielson Law Office, LLC
Greenwood, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

JAMES E. WHITFIELD, M.D. and ST. JOSEPH )
PRIMARY CARE, LLC, )
           )
    Appellants-Defendants, )
           )
       vs. )
           )
JERRY WREN, Individually, and As Personal )
Representative of The Wrongful Death Estate of )
LESLIE WREN, )
           )    No. 34A02-1307-CT-660
    Appellees-Plaintiffs )
           )
       vs. )
           )
KINDRED NURSING CENTERS LIMITED )
PARTNERSHIP d/b/a KINDRED )
TRANSITIONAL CARE and REHABILITATION- )
KOKOMO, BRUCE ROBB, M.D., and )
UNIVERSITY SURGEONS, INC., )
           )
    Appellants-Defendants. )

APPEAL FROM THE HOWARD SUPERIOR COURT
The Honorable Brant J. Parry, Judge
Cause No. 34D02-1212-CT-1204

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

In this interlocutory appeal, James E. Whitfield, M.D. and St. Joseph Primary Care, LLC ("St. Joseph," and collectively with Dr. Whitfield, the "Appellants") appeal the trial court's denial of their motion for summary judgment in favor of Jerry Wren, individually, and as personal representative of the wrongful death estate of his daughter, Leslie Wren (collectively, "Wren").[1] The Appellants raise three issues which we consolidate and restate as whether the court erred in denying their motion for summary judgment. We affirm.

FACTS AND PROCEDURAL HISTORY

On December 6, 2007, twenty-four year old Leslie Wren was admitted to the Clarian North Medical Center with abdominal complications related to her Crohn's colitis. That same day, she underwent total abdominal colectomy with proctectomy and ileostomy performed by colorectal surgeon, Bruce Robb, M.D. After the operation, Leslie received pain and psychiatric medications. On January 4, 2008, Leslie was discharged from Clarian North Medical Center with instructions to take medications including a Fentanyl patch and

---

[1] We note that Kindred Nursing Centers Limited Partnership d/b/a Kindred Transitional Care and Rehabilitation – Kokomo, Bruce Robb, M.D., and University Surgeons, Inc., are also named as defendants below. However, the summary judgment order which is the subject of this interlocutory appeal applies to only Wren's complaint against the Appellants.

We also note that the Indiana Trial Lawyers Association ("ITLA") has filed an amicus brief in support of Wren. We thank ITLA for its informative brief.

Dilaudid for pain, and she was then admitted to Windsor Estates for rehabilitation.[2] Dr. Whitfield, an employee of St. Joseph, was the medical director at Windsor Estates. During her time there, Leslie continued to be treated by Dr. Robb, who controlled the pain medication orders at the facility, and questions by the nursing staff regarding her pain were directed to him.

On January 11, 2008, Dr. Whitfield saw Leslie and completed a history and physical for her. In the days thereafter, she was monitored and administered pain medications as needed. Leslie complained of abdominal pain and nausea with some vomiting. On January 14, 2008, at approximately 5:00 p.m., the nursing staff noted that Leslie's glucose was elevated and contacted Dr. Whitfield, who ordered five units of Humalog insulin and to recheck her blood sugar in two to four hours, as well as fifteen units of insulin to be added to her next TPN bag. At 6:00 p.m., Jerry Wren reported to the nursing staff that Leslie was bleeding, two open areas on her coccyx were identified, Dr. Whitfield was notified, and orders for daily wet-to-dry dressing changes were ordered for that area of Leslie's body. At 9:00 p.m., Leslie's blood glucose was checked and noted to be high, and after being notified Dr. Whitfield ordered twenty-five additional units of Humalog be immediately administered. Also at around 9:00 p.m., Leslie complained of feeling weak to a nurse who checked her vital signs revealing a blood pressure of 100/60, heart rate 120, respirations 20, and oxygen saturation 94% on room air. The nurse noted that Leslie's arms, hands, and legs were cool to the touch. At 9:30 p.m., Leslie received 2 mg of Dilaudid after complaining of pain, and an

_____

[2] Windsor Estates is owned by the Kindred Nursing Centers Limited Partnership, which as noted in

3

hour later another nurse noted that Leslie "was yelling out and demanding more Dilaudid." Appellants' Appendix at 102. Dr. Whitfield was not notified of this.

At midnight on June 15, 2008, a nurse noted that Leslie was lying in bed with her eyes open and watching TV. At 1:30 a.m., the nurse entered the room and found Leslie unresponsive with no blood pressure, pulse, or respirations. CPR was initiated, and 911 was called. Drs. Whitfield and Robb were both notified of the situation. At 2:05 a.m., the emergency personnel stated that Code Activities were to be stopped, and Drs. Whitfield and Robb were notified of Leslie's death. An autopsy revealed that Leslie's cause of death was "acute mixed drug intoxication." Id. at 103.

On January 11, 2010, Wren filed a proposed complaint (the "Proposed Complaint") against Dr. Whitfield and St. Joseph, as well as Kindred Nursing Centers Limited Partnership d/b/a Kindred Transitional Care and Rehabilitation-Kokomo ("Kindred"), Dr. Robb, and University Surgeons, Inc. ("University Surgeons"), with the Indiana Department of Insurance alleging that "[t]he medical treatment provided by Defendants fell below the standard of care within the medical community and proximately caused or proximately contributed to Leslie Wren's death." Id. at 29. Pursuant to Ind. Code § 34-18-10-17, the parties filed their Submissions with the Medical Review Panel (the "Panel"), and the Panel convened on July 23, 2012 to review the submitted evidence. On August 30, 2012, after reviewing the evidence submitted the Panel unanimously rendered the following expert opinion (the "Panel Opinion") with respect to the care and treatment provided by all of the Defendants: "[t]he

note 1 is also a named defendant below.

4

evidence does not support the conclusion that the Defendants failed to meet the applicable standard of care as charged in the [Proposed Complaint], and the conduct complained of was not a factor in the resultant damages." Id. at 31.

On December 3, 2012, Wren filed a complaint for damages in the Howard County Superior Court against Dr. Whitfield, St. Joseph, Kindred, Dr. Robb, and University Surgeons. On December 20, 2012, Dr. Robb and University Surgeons filed a motion for summary judgment, and subsequently on January 24, 2013, the Appellants filed their motion for summary judgment, along with a memorandum in support and designation of evidence, stating that Wren "has not offered any expert testimony to refute the Opinion of the Medical Review Panel." Id. at 21. On or about February 19, 2013, Wren filed a response in opposition to both summary judgment motions (the "Response"), as well as a memorandum in support and designation of evidence in which Wren designated the affidavit of Robert Gregori, M.D., in opposition to the Panel Opinion. Dr. Gregori's affidavit contained the following statements related to the medical care provided by Dr. Whitfield:

36. That in my expert opinion, based upon my education, training and clinical experience, the development of pressure ulcers, elevated BUN and elevated potassium is the direct and proximate result of defendants' failure to measure and record Leslie's intake and output, failure to reweigh Leslie and failure to treat Leslie's nausea and vomiting and is more likely than not the proximate cause, or contributing cause, to Leslie's death.

72. That[,] with respect to defendant Dr. Whitfield, based upon my education, training and personal clinical experience it is my professional opinion to a reasonable degree of medical certainty that Dr. Whitfield's failure to check, evaluate, monitor, and treat Leslie's physical condition, including the signs and symptoms of significant dehydration and electrolyte derangement, was not reasonable under the

5

circumstances, was a breach in the standard of care and more likely than not caused or contributed to Leslie Wren's death.

Id. at 56, 59.

On March 7, 2013, Dr. Robb and University Surgeons withdrew their motion for summary judgment. Then, on March 21, 2013, the Appellants filed their reply (the "Reply") to Wren's Response in which they argued that Wren's Submission to the Panel contained a "sole allegation against Dr. Whitfield (and St. Joseph . . . his employer)" which concerned his "response to Leslie Wren's blood sugar," claiming that it "was not reasonable." Id. at 61. The Appellants' Reply stated that "their Submission [] addressed only the allegation regarding Dr. Whitfield's role in monitoring Leslie Wren's blood sugar." Id. The Reply suggested that Wren in his Response raised issues through the affidavit of Dr. Gregori which were not before the Panel and that accordingly such issues were not properly before the court, citing to K.D. v. Chambers, 951 N.E.2d 855 (Ind. Ct. App. 2011), trans. denied, disapproved on other grounds by Spangler v. Bechtel, 958 N.E.2d 458, 466 n.5 (Ind. 2011). The Reply was accompanied by a supplemental designation of evidence which designated Wren's Submission to the Panel, the Appellants' Submission, and Wren's Reply Submission.

On March 25, 2013, Wren filed an Objection to the Appellants' Reply and a Motion to Strike the Supplemental Designation of Evidence asserting that the Appellants were not allowed to file the Supplemental Designation, that the Reply was untimely, that the Submissions designated in the Supplemental Designation consist of arguments made by attorneys which are not evidence, and that the Appellants' reliance on K.D. is misplaced. On April 18, 2013, Appellants filed their Reply to Wren's Objection and Motion to Strike stating

that Wren's "attempt to persuade this Court that the Submissions presented to the Medical Review Panel cannot be considered by this Court in ruling on [the Appellants'] claim . . . is in direct conflict of Indiana statute, legal precedent and logic." Id. at 135. On May 30, 2013, the court heard oral argument on Appellants' summary judgment motion and Wren's Motion to Strike, and took the matters under advisement. On June 12, 2013, the court entered its order denying the Appellants' summary judgment motion (the "Order") stating as follows:

1. The Supplemental Evidence filed by the [Appellants] on March 21, 2013 in reply to [Wren's] response to Summary Judgment shall be considered by the court.

2. The [Appellants] argue[] that [Wren] must make specifically [sic] allegations in his complaint to the Department of Insurance. The [Appellants go] on to argue that [Wren] cannot present evidence at [sic] in this cause as to alleged negligence that was not specifically pled to the Department of Insurance.

3. [Wren] argues the complaint to the Department of Insurance is not required to be specifically pled. [Wren] argues [he] alleged that the medical providers['] care fell below the standard of care.

4. The Court notes that the form complaint located on the State Department of Insurance [website] (in.gov) simply includes a generic statement that the medical provider's care fell below the requisite standard of care. It is not specifically pled.

5. The issue concerning the care provided by the medical providers in this case, in all aspects, shall be determined by the jury.

6. [The Appellants'] Motion for Summary Judgment is DENIED.

Id. at 11.

On July 9, 2013, the Appellants timely filed their Motion for Certification of Interlocutory Order for Appeal pursuant to Ind. Appellate Rule 14(B)(1), which the court

7

granted on July 17, 2013. On July 18, 2013, Wren filed an Objection to the Appellants' motion, and the court noted in the chronological case summary ("CCS") that the motion was moot as the Appellants' motion had been ruled upon. On July 22, 2013, Wren filed a motion to reconsider granting the Appellants' motion and stay of trial court proceedings, and the court denied Wren's motion.

ISSUE / STANDARD OF REVIEW

The issue is whether the court erred in denying the Appellants' motion for summary judgment. When a trial court's ruling granting or denying summary judgment is challenged on appeal, our standard of review is the same as it is for the trial court. Kroger Co. v. Plonski, 930 N.E.2d 1, 4 (Ind. 2010). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." Gill v. Evansville Sheet Metal Works, Inc., 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the non-moving party must come forward with evidence establishing the existence of a genuine issue of material fact. Id. We construe all factual inferences in favor of the non-moving party and resolve all doubts as to the existence of a material issue against the moving party. Plonski, 930 N.E.2d at 5. An appellate court reviewing a challenged trial court summary judgment ruling is limited to the designated evidence before the trial court, see Ind. Trial Rule 56(H), but is constrained to neither the claims and arguments presented at trial nor the rationale of the trial court ruling. See Woodruff v. Ind. Family & Soc. Servs. Admin., 964 N.E.2d 784, 790 (Ind. 2012) ("We will reverse if the law

8

has been incorrectly applied to the facts. Otherwise, we will affirm a grant of summary judgment upon any theory supported by evidence in the record."), cert. denied, 133 S. Ct. 233 (2012); Wagner v. Yates, 912 N.E.2d 805, 811 (Ind. 2009) ("[W]e are not limited to reviewing the trial court's reasons for granting or denying summary judgment but rather we may affirm a grant of summary judgment upon any theory supported by the evidence.").

The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

To the extent that the parties' arguments require us to interpret sections of the Medical Malpractice Act (the "Act"), we note that the first step in statutory interpretation is to determine whether the legislature has spoken clearly and unambiguously on the point in question. McCarty v. Sanders, 805 N.E.2d 894, 898 (Ind. Ct. App. 2004), trans. denied. When a statute is clear and unambiguous, courts need not, and indeed shall not, apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. Id. Questions of statutory interpretation are particularly amenable to resolution by summary judgment. Id.

## DISCUSSION

In general, "[t]o prevail in a medical malpractice action, the plaintiff must prove three elements: '(1) a duty on the part of the defendant in relation to the plaintiff; (2) failure to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure.'" Blaker v. Young, 911 N.E.2d 648, 651 (Ind. Ct. App. 2009) (quoting Oelling v. Rao, 593 N.E.2d 189, 190 (Ind. 1992)), reh'g denied, trans. denied. When the defendant doctor moves for summary judgment and can show there is no genuine issue of material fact that the designated evidence establishes that any one of these elements is not met, the defendant is entitled to summary judgment as a matter of law unless the plaintiff can establish, by expert testimony, a genuine issue of material fact for trial. Id.

Here, rather than challenging the evidence regarding an element of medical malpractice, the crux of the Appellants' position is that Wren is attempting to impermissibly raise an allegation of malpractice in the trial court which was not raised at the Panel stage. The Appellants direct our attention to Wren's Submission, specifically to the conclusion of the Submission, which states the following:

> The evidence in the medical records shows the following:
>
> 1. Medication prescribed by Dr. Robb was not reasonable under the circumstances;
>
> 2. Administration of medications by Windsor Estates was not reasonable under the circumstances;
>
> 3. Management of Leslie's fluid and electrolytes was not reasonable under the circumstances; and

10

4.       Windsor Estates' and/or Dr. Whitfield's management of Leslie's blood sugar was not reasonable under the circumstances.

Appellants' Appendix at 89-90.

The Appellants argue that Wren's Submission "only discussed Dr. Whitfield's treatment of [Leslie] when addressing the issue of response to [her] January 14, 2008 blood glucose results," noting that "in discussing the allegation of management of fluids and electrolytes, Wren specifically argued 'Windsor Estates' monitoring of Leslie for signs of symptoms of fluid and/or electrolyte imbalance was not reasonable under the circumstances.'" Appellants' Brief at 10. The Appellants also note that Wren did not "raise any additional issues as to Dr. Whitfield" in their Reply Submission, making it "clear that the sole allegation to the . . . Panel as to [Appellants] was that [Dr. Whitfield] failed to recognize that [Leslie] was having an adverse emergent reaction as evidenced by her reported high blood sugar." Id. at 11. The Appellants argue, consistent with their position taken below, that other allegations against them run afoul of this court's holding in K.D. v. Chambers, and the trial court's Order failed to comply with K.D. when it held that Wren was "not required to specifically plead all claims of medical negligence in its Submission . . . ." Id. at 17. The Appellants argue that Dr. Gregori did not opine "on the sole claim that Wren had presented" to the Panel and accordingly the court's "ruling that the designated facts and opinion of Dr. Gregori were sufficient to create a material issue of fact was in error." Id. at 13.

Wren argues that the court's ruling denying summary judgment is appropriate because he is not required to plead or argue specific breaches to the Panel, and genuine issues of material fact exist regarding breach and causation. He contends that the Act, specifically Ind.

11

Code § 34-18-8-4, requires that the proposed complaint be presented to the medical review panel but that "there is no requirement for a plaintiff to fully explicate and provide the particulars or legal contentions regarding a claim." Appellee's Brief at 12 (citing Miller v. Mem'l Hosp. of S. Bend, 679 N.E.2d 1329, 1332 (Ind. 1997)). Wren argues that Indiana utilizes principles of notice pleading and that "[t]here is nothing in the Act requiring [Wren] to plead specific breaches of the standard of care in his proposed complaint." Id. He notes that in this case, the Panel Opinion merely stated that "[t]he evidence does not support the conclusion that the Defendants failed to meet the applicable standard of care as charged in the complaint [aka, the Proposed Complaint], and the conduct complained of was not a factor in the resultant damages," and that the Proposed Complaint stated regarding a malpractice claim that "[t]he medical treatment provided by Defendants fell below the standard of care within the medical community and proximately caused or proximately contributed to Leslie Wren's death." Appellants' Appendix at 29, 31. He also notes that the medical review panel "cannot write its own opinion" and instead chooses "an opinion contained within the Act" pursuant to Ind. Code § 34-18-10-22(b). Appellee's Brief at 12.

Wren maintains that he is not required by the Act to make any argument to the Panel but that he nevertheless made several in his Submission, including arguments regarding Dr. Whitfield's conduct. He argues that K.D. "does not supplant the Supreme Court opinion in Miller" and "does not re-write the Act by adding a requirement that plaintiffs must argue each alleged breach . . . ." Id. at 13-14. He also notes that K.D. is distinguishable from this case in that the Appellants argue Wren "did not include the breach of the standard of care in

12

his **arguments** to the [Panel]" and should accordingly "be precluded from presenting his arguments to the jury," whereas the court in K.D. "found that the plaintiffs could not present breaches of the standard of care that were not presented to the medical review panel when the plaintiffs failed to present the **evidence** that supported those breaches." Id. at 14. Wren asserts that "it is undisputed that the [P]anel was given evidence of Dr. Whitfield's conduct in the form of the medical records," on which the Panel was "required to base their opinions . . . ." Id. He suggests that the rule advocated for by the Appellants would usurp the function and authority of the medical review panel and would create a technical trap for plaintiffs. Wren also argues that the Appellants' interpretation of the Act's requirements that specific breaches in the standard of care be identified in the proposed complaint or submission violates certain constitutional rights, including the right to trial by jury, the right to due process, and the Privileges and Immunities Clause.

Further, as noted above in Footnote 1, ITLA filed an amicus brief in support of Wren in which it argues that this court's holding in K.D. "conflicts with the Indiana Supreme Court's holding in Miller" where the Court "unambiguously held that a plaintiff's medical malpractice action was not limited by the arguments presented by the plaintiff to the medical review panel" when it stated:

> We decline to accept Memorial Hospital's argument that the plaintiffs' action is restricted by the substance of the submissions presented to the medical review panel. Pursuant to the statute, the panel was authorized to review the medical records and other submitted material pertaining to each defendant's treatment of Nicholas. See IND. CODE § 16-9.5-9-4 (repealed and replaced in 1993 by IND. CODE § 27-12-10-17). While a medical malpractice plaintiff must, as a prerequisite to filing suit, present the proposed complaint for review and expert opinion by a medical review panel, there is no requirement for such

13

plaintiff to fully explicate and provide the particulars or legal contentions regarding the claim.

Amicus Brief at 4 (quoting Miller, 679 N.E.2d at 1332).  ITLA asserts that the court in K.D. attempted to distinguish Miller by observing that while Miller concerned "whether the plaintiff had adequately raised the distinction between two different injuries in his submission . . . the issue in [K.D.] was whether the plaintiffs failed to present all of their claims of malpractice in their submission," and it argues that K.D.'s "reading of Miller is too narrow" because "[t]he argument in Miller was not merely that the plaintiff failed to raise the distinction between two different injuries at the panel stage, *but that the failure to raise that distinction constituted a failure to present the claim to the panel*."  Id. at 5.  ITLA also argues that the K.D. court's attempt to distinguish Miller by suggesting that while the question in Miller concerned "waiver of a legal issue," the issue in K.D. was "waiver of a factual question," was erroneous because both issues are "decided by the panel per the terms of the Act."  Id. at 6.  For these and other reasons, ITLA invites this court to reconsider the K.D. decision.

Ind. Code § 34-18-8-4 provides in relevant part that "an action against a health care provider may not be commenced in a court in Indiana before: (1) the claimant's proposed complaint has been presented to a medical review panel established under IC 34-18-10 . . . ; and (2) an opinion is given by the panel."[3]  The medical review panel's expert opinion addresses "whether or not the evidence supports the conclusion that the defendant or

---

[3] Ind. Code § 34-18-8-4 contains limited exceptions which are not relevant in this matter.

14

defendants acted or failed to act within the appropriate standards of care as charged in the complaint." Ind. Code § 34-18-10-22(a). The Act, in Ind. Code § 34-18-10-17, discusses what evidence the medical review panel shall consider, providing in subsection (a) that "[t]he evidence in written form to be considered by the medical review panel shall be promptly submitted by the respective parties," and in subsection (b) it specifically defines what constitutes "evidence" as "medical charts, x-rays, lab tests, excerpts of treatises, depositions of witnesses including parties, and any other form of evidence allowable by the medical review panel." Ind. Code § 34-18-10-21, titled "[d]uties of panel in conduct of inquiry; access to information," provides:

(a)     The panel has the right and duty to request all necessary information.

(b)     The panel may consult with medical authorities.

(c)     The panel may examine reports of other health care providers necessary to fully inform the panel regarding the issue to be decided.

(d)     Both parties shall have full access to any material submitted to the panel.

Thus, a medical review panel has the power, even the duty, to request and review all necessary information in deciding whether a breach in the standard of care occurred, even if such information is not submitted to the panel by a party.

The Act also specifies what a medical review panel expert opinion may contain as follows:

After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty (30) days, give one (1) or more of the following expert opinions, which must be in writing and signed by the panelists:

15

(1)     The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.

(2)     The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.

(3)     There is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury.

(4)     The conduct complained of was or was not a factor of the resultant damages. If so, whether the plaintiff suffered:

   (A)     any disability and the extent and duration of the disability; and

   (B)     any permanent impairment and the percentage of the impairment.

Ind. Code § 34-18-10-22(b).  The Panel Opinion was consistent with subparagraph (2).

A panel of this court, in K.D., examined the issue of whether the trial court abused its discretion when it granted a motion in limine filed by an R.N. and Riley Children's Hospital (the "Defendants") "to exclude evidence of breaches of the standard of care, other than the overdose of Benadryl, that were not presented to the medical review panel." 951 N.E.2d at 857.  The proposed complaint filed by K.D. and his mother Michelle Campbell (the "Plaintiffs") in that case contained two counts alleging that: (1) "[the two physicians] were careless and negligent in [the] care and treatment of [K.D.], as [K.D.] suffered a Benadryl overdose while under their care. [K.D.] received various other overdoses while under the care of defendant [sic];" and (2) "[a]s a direct and proximate result of the carelessness and

16

negligence of [the Hospital], its employee nurse Adrianne Chambers and it's [sic] medical staff, [K.D.] suffered from multiple overdoses administered by defendants." Id. at 858. The Plaintiffs tendered a submission to the medical review panel "setting forth issues, facts, and evidence" and

> stated the "issues presented in this case" as:

>> Whether the Defendant, [Nurse] Chambers . . . was negligent and breached the standard of care in one or more of the following ways:

>>> 1) Failed to give the proper dosage of Benadryl as it was ordered.

>>> 2) Failed to question or ensure whether the dosage of Benadryl that she gave was an appropriate dosage for a child who weighed 15 kg.

Id. at 859. The court observed that "Plaintiffs' submission referred to the Proposed Complaint, attached as an exhibit along with medical records, but did not specify any overdoses or breaches of the standard of care other than the overdose of Benadryl." Id.

The medical review panel issued its expert opinion that both the R.N. and the hospital failed to comply with the appropriate standard of care, and the Plaintiffs filed a complaint in the trial court "with allegations materially identical to their proposed complaint." Id. The Defendants filed a motion in limine "to exclude 'all references to any claim of negligent infliction of emotional distress on behalf of [Campbell] because Plaintiffs failed to properly plead this cause of action.'" Id. The Plaintiffs filed a response to the Defendants' motion as well as

17

a proposed issue instruction outlining three claims of breaches of the standard of care: 1) that K.D. was given ten times more than the recommended dose of Benadryl; 2) that "the rate at which the Benadryl was pushed was deviation in the standard of care"; and 3) that "the giving of additional central nervous system depressants in the face of specific order to the contrary was a deviation in the standard of care."

Id. (citation omitted). The Defendants responded to this proposed issue instruction with "a Second Motion in Limine to exclude all references to the latter two claimed breaches of the standard of care, arguing these breaches had not been presented to the Review Panel and were not properly before the trial court." Id. The court held a hearing on the Defendants' motions and granted each motion, ruling that "Plaintiffs shall not mention or convey to the jury any claim of negligent infliction of emotional distress on behalf of Campbell" and that "Plaintiffs shall not mention, offer evidence of, or convey to the jury 'any alleged breaches in the standard of care that were not presented to the Medical Review Panel.'"[4] Id. at 860.

On interlocutory appeal, the court first examined the trial court's ruling regarding the negligent infliction of emotional distress claim and affirmed the trial court, holding that the claim was not sufficiently pled.[5] Id. at 862-863. The court proceeded to address the trial court's ruling "to exclude any evidence of breaches of the standard of care that were not presented to the Review Panel," specifically the Plaintiffs' argument that the court erred in excluding evidence regarding "the rate at which the Benadryl was administered and all evidence regarding the improper administration of additional central nervous system

___

[4] The court also granted by separate order a motion to exclude the expert testimony of Plaintiffs' expert, on grounds that he was not properly qualified to offer expert medical testimony. 951 N.E.2d at 859-860.

[5] We note that in K.D. the court made the observation that "[n]egligent infliction of emotional distress is an independent tort and not merely an element of damages." 951 N.E.2d at 862. The Indiana Supreme

18

depressants to [K.D.] while he was hospitalized on the grounds that these claimed breaches were not specified in Plaintiffs' proposed complaint or their submission to the Review Panel." Id. at 863 (internal quotations omitted). This court began its analysis of the question by observing certain statutory provisions of the Act and stating that as such provisions "show, the question of whether defendants breached the standard of care must be presented to the medical review panel and answered based on the evidence submitted to it." Id. at 864. The court then noted:

> It logically follows that a malpractice plaintiff cannot present one breach of the standard of care to the panel and, after receiving an opinion, proceed to trial and raise claims of additional, separate breaches of the standard of care that were not presented to the panel and addressed in its opinion.

Id.

The court observed that the proposed complaint alleged, in addition to the overdose of Benadryl, that K.D. was given "'multiple overdoses' and 'various other overdoses'" and noted that such "pleading allegations were not per se insufficient, under notice pleading, to give Defendants notice of claimed breaches of the standard of care other than the overdose of Benadryl." Id. The court then stated that "[h]owever, Plaintiffs' submission to the Review Panel contained no statement or argument and, so far as can be discerned from the appellate record, no evidence of any breaches besides the overdose of Benadryl," noting that the Plaintiffs' submission stated only the issue of the dosage of Benadryl for the medical review panel's consideration. Id. The court stated that accordingly the panel's conclusion that the

---

Court, in Spangler v. Bechtel, 958 N.E.2d 458, 466 n.5 (Ind. 2011), expressly disapproved of this statement.

19

Defendants failed to comply with the standard of care impliedly regarded "only the Benadryl overdose . . . ." Id.

As does Wren in his brief, the Plaintiffs in K.D. pointed to the Indiana Supreme Court's holding in Miller in support of their position that the issues of the rate at which the Benadryl was administered and the giving of additional central nervous system depressants in the face of specific order could be brought in the complaint to the court. Id. The K.D. court analyzed Miller as follows:

> Miller involved the issue of whether a plaintiff's proposed complaint sufficiently articulated two separate injuries so as to avoid certain limitations on recovery imposed by the [Act]. [679 N.E.2d] at 1330. After concluding the complaint was sufficient in that respect, our supreme court rejected the hospital's argument that the plaintiffs were required and failed to raise the distinction between the two injuries in their submission to the medical review panel. See id. at 1331 (noting the hospital's argument "that the plaintiffs never raised the distinction between prenatal and postnatal injuries in their . . . submission to the medical review panel . . . ."). It was in response to that specific argument that our supreme court wrote the following language, upon which Plaintiffs now rely:

> > We decline to accept Memorial Hospital's argument that the plaintiffs' action is restricted by the substance of the submissions presented to the medical review panel . . . . While a medical malpractice plaintiff must, as a prerequisite to filing suit, present the proposed complaint for review and expert opinion by a medical review panel, there is no requirement for such plaintiff to fully explicate and provide the particulars or legal contentions regarding the claim.

> Id. at 1332. As we are addressing a different issue, namely, Plaintiffs' failure to present all claimed breaches of the standard of care to the Review Panel, we do not interpret the above language so broadly as to allow a plaintiff to argue at trial separate breaches of the standard of care that were not presented in a submission of evidence to the panel. Whereas the number of occurrences of malpractice and allowable recoveries under the [Act] has been treated as a question of law, see Patel v. Barker, 742 N.E.2d 28, 31-33 (Ind. Ct. App.

20

2001) (addressing statutory interpretation), [reh'g denied,] trans. denied, the factual question of whether the standard of care was breached must be initially addressed and answered by the panel. See Ind. Code § 34-18-10-22.

Id. at 864-865.

The court held that the medical review panel "was not presented the question of whether 'the giving of additional central nervous system depressants in the face of specific order to the contrary was a deviation in the standard of care'" and that "[b]ecause the giving of additional improper doses was not within the scope of Plaintiffs' submission to the Review Panel, they cannot now raise the same as a separate breach" in the trial court, and affirmed the trial court's ruling to exclude such evidence. Id. at 865. The K.D. court reversed, however, the trial court's ruling that the Plaintiffs could not present evidence regarding the rate at which the Benadryl was administered, ruling that "[t]he failure to give the proper dosage to a child can encompass both the total amount of the drug administered as well as the rate at which the drug is administered" and that "Defendants make too fine a distinction in arguing that only the total amount, not the rate, was before the Review Panel when both allegations stem from the same operative fact of the Benadryl overdose." Id.

DECISION

In accordance with Ind. Code § 34-18-8-4, Wren filed his Proposed Complaint on January 11, 2010, which contained the general allegation against the Appellants, as well as Kindred and University Surgeons, that "[t]he medical treatment provided by Defendants fell below the standard of care within the medical community and proximately caused or proximately contributed to Leslie Wren's death." Appellants' Appendix at 29. Following

21

the filing of the Proposed Complaint, Wren filed his Submission, which included a narrative prepared by counsel and cited to certain attached exhibits.[6] Wren's Submission contained the following relevant statements: (1) "Dr. Whitfield's job was to manage Leslie's nutritional status, including parenteral nutrition. It was Dr. Whitfield's job to intervene if something were to go wrong with Leslie's fluid and electrolyte balance, blood sugars, and general medical condition;" (2) Though cause of Leslie's death "was ruled acute mixed drug intoxication[, i]n addition, she had other life-threatening conditions develop in the 24 hours before she died that went untreated;" and (3) "[m]anagement of Leslie's fluid and electrolytes was not reasonable under the circumstances . . . Windsor Estates' and/or Dr. Whitfield's management of Leslie's blood sugar was not reasonable under the circumstances." Id. at 75-76, 90. In addition, following the filing of the Appellants' Submission, Wren filed a Reply Submission which stated that Leslie's "potassium levels continuously rose throughout her stay at Windsor and as such should have been more closely monitored and tested, prior to her death" and "should have been discovered if the doctors followed the appropriate standard of care." Id. at 114.

Further, we observe that in his Submission, under the heading "INTRODUCTION," Wren stated specifically:

> Throughout this submission Jerry will draw attention to specific records. However, Jerry does not intend to limit his claim of negligence to only the specific records he has highlighted. As a lay person, Jerry relies upon the expertise of this panel to identify all breaches in the standard of care that may have been **a factor** in his daughter's death. Thus, Jerry's submission is

---

[6] We note that the record contains only the narrative portion and does not contain the medical records upon which the statements are based.

not intended to be construed as argument for specific breaches in the standard of care. Nor should his submission be construed as limiting his allegations of malpractice to specific identified acts and/or omissions. In addition, Jerry Wren discloses that he expects to hold Windsor Estates accountable for the acts and/or omissions of not only its employees, but also of its agents and/or representatives, including Dr. Whitfield.

Id. at 77.

As noted, although the Proposed Complaint contained only the general allegation that the treatment provided by each defendant fell below the standard of care and caused or contributed to Leslie's death, in the conclusion portion of his Submission Wren stated as follows:

All defendants warranted they possessed the requisite skill and knowledge to competently treat Leslie. Leslie and her parents had the right to believe that all of Leslie's health care providers would provide medical and/or nursing care based upon generally accepted scientific principles, methods, treatments, and current professional theory and practice.

Leslie was only 24 years old. She was admitted to Windsor Estates for the sole purpose of getting stronger so that she could go home to her parents. Instead, she died with bedsores, hyperglycemic, hyperkalemic, in acute renal failure likely from severe dehydration and/or diabetic ketoacidosis, and severely overmedicated.

The evidence in the medical records shows the following:

1.     Medication prescribed by Dr. Robb was not reasonable under the circumstances;

2.     Administration of medications by Windsor Estates was not reasonable under the circumstances;

3.     Management of Leslie's fluid and electrolytes was not reasonable under the circumstances; and

4.     Windsor Estates' and/or Dr. Whitfield's management of Leslie's blood sugar was not reasonable under the circumstances.

23

Id. at 89-90.

Following the Panel Opinion, Wren filed a complaint in the trial court alleging one count of medical malpractice containing fifty-eight numbered statements including the statement that "[i]t was Dr. Whitfield's job to intervene if something went wrong with Leslie's fluid and electrolyte balance, blood sugar and general medical condition." Id. at 16. The Appellants filed a motion for summary judgment stating that Wren "has not offered any expert testimony to refute the Opinion of the Medical Review Panel," id. at 21, to which Wren responded by designating Dr. Gregori's affidavit which contained the following:

36. That in my expert opinion, based upon my education, training and clinical experience, the development of pressure ulcers, elevated BUN and elevated potassium is the direct and proximate result of defendants' failure to measure and record Leslie's intake and output, failure to reweigh Leslie and failure to treat Leslie's nausea and vomiting and is more likely than not the proximate cause, or contributing cause, to Leslie's death.

72. That[,] with respect to defendant Dr. Whitfield, based upon my education, training and personal clinical experience it is my professional opinion to a reasonable degree of medical certainty that Dr. Whitfield's failure to check, evaluate, monitor, and treat Leslie's physical condition, including the signs and symptoms of significant dehydration and electrolyte derangement, was not reasonable under the circumstances, was a breach in the standard of care and more likely than not caused or contributed to Leslie Wren's death.

Id. at 56, 59. The Appellants in their Reply challenged these statements as running afoul of K.D. by arguing that Wren's sole allegation of malpractice as presented in his Submission against the Appellants regarded his "response to Leslie Wren's blood sugar" and that Wren was raising issues which were not before the Panel. Id. at 61. The trial court denied the

24

Appellants' summary judgment motion, finding that the form proposed complaint "simply includes a generic statement that the medical provider's care fell below the requisite standard of care" and "is not specifically pled." Id. at 11.

Although the panel in K.D. examined the statements and arguments made by counsel in the Plaintiffs' submission, its holding, which allowed the Plaintiffs to present evidence related to the rate at which the Benadryl was administered while foreclosing their attempt to present evidence regarding whether the giving of additional central nervous system depressants was a deviation in the standard of care, focused on the fact that the only evidence which was submitted to the medical review panel for their consideration concerned the Benadryl overdose. 951 N.E.2d at 864. Here, the Appellants do not argue that evidence such as medical charts, x-rays, lab tests, excerpts of treatises, depositions of witnesses including parties, and any other form of evidence allowable by the medical review panel related to Leslie's "physical condition, including the signs and symptoms of significant dehydration and electrolyte derangement," was not before the Panel. Appellants' Appendix at 59. Wren's Submission specifically identified that the "[m]anagement of Leslie's fluid and electrolytes was not reasonable under the circumstances," which is precisely the issue Wren is attempting to present at the trial court level. Id. at 90. Although this statement did not specifically identify the Appellants as the subject of the alleged breach in the standard of care, it did not identify any specific party. Indeed, Wren's Submission specifically stated that it was Dr. Whitfield's responsibility "to intervene if something were to go wrong with Leslie's fluid and electrolyte balance, blood sugars, and general medical condition," and

25

accordingly it appears that among the defendant parties, the statement was directed to Dr. Whitfield. In any event, it is clear that evidence relevant to this breach was presented to the Panel as required by the Act.

The purpose of the medical review panel is to "review proposed malpractice complaints . . . ." Ind. Code § 34-18-10-1. The panel's "sole duty" is to "express [an] expert opinion as to whether or not the *evidence* supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care *as charged in the complaint.*" Ind. Code § 34-18-10-22(a) (emphases added). Wren's Proposed Complaint charged that "[t]he medical treatment provided by Defendants fell below the standard of care within the medical community and proximately caused or proximately contributed to Leslie Wren's death." Appellants' Appendix at 29. Wren timely filed his Submission which contained evidence related to an alleged breach in the standard of care regarding Leslie's fluid and electrolyte balance, and it can therefore be presumed that the Panel considered such a breach and addressed it in the Panel Opinion. See Miller, 679 N.E.2d at 1332 (holding that the medical review panel is "authorized to review the medical records and other submitted material pertaining to each defendant's treatment of" a patient and that "[w]hile a medical malpractice plaintiff must, as a prerequisite to filing suit, present the proposed complaint for review and expert opinion by a medical review panel, there is no requirement for such plaintiff to fully explicate and provide the particulars or legal contentions regarding the claim"); see also Johnson v. St. Vincent Hosp., Inc., 273 Ind. 374, 390-391, 404 N.E.2d 585, 596 (1980) (discussing the medical review panel process of the Act and holding that "[t]he

26

statute contemplates that the panel will function in an informal and reasonable manner," that "[t]he scope of the panel's function is limited," in which "[i]t does not conduct a hearing or trial and does not render a decision or judgment," that "[t]here is, therefore, no reason to mandate that the statute relegate burdens of proof or production and to otherwise specify procedures applicable in hearings and trials," and that "[t]here is little likelihood that [an] appellant will incorrectly estimate the steps that should be taken in procuring and presenting evidence and authorities to the panel, and should he do so there is little or no risk that he will be harmed thereby"), abrogated on other grounds by Collins v. Day, 644 N.E.2d 72, 75 (Ind. 1994), overruled on other grounds by In re Stephens, 867 N.E.2d 148, 156 (Ind. 2007). The argument by the Appellants that this alleged breach did not apply against them, at a minimum, makes "too fine a distinction" to pass muster. K.D., 951 N.E.2d at 865. We therefore conclude that the court did not err in denying the Appellants' motion for summary judgment.

CONCLUSION

For the foregoing reasons, we affirm the court's denial of the Appellants' summary judgment motion, and we remand for further proceedings consistent with this opinion.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.