FILED

Oct 04 2016, 5:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Michael E. O'Neill
Nathan D. Hansen
O'Neill McFadden & Willett LLP
Schererville, Indiana

ATTORNEYS FOR AMICUS CURIAE

Donald B. Kite, Sr.
Wuertz Law Office, LLC
Indianapolis, Indiana

Crystal G. Rowe
Kightlinger & Gray, LLP
New Albany, Indiana

ATTORNEY FOR APPELLEE

James H. Young
Young & Young
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE

Jerry Garau
Garau Germano, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles McKeen, M.D., <br> *Appellant-Defendant,* <br><br> v. <br><br> Billy Turner, <br> *Appellee-Plaintiff* | October 4, 2016 <br><br> Court of Appeals Case No. <br> 53A05-1511-CT-2047 <br><br> Appeal from the Monroe Circuit Court <br><br> The Honorable Frances G. Hill, Judge <br><br> Trial Court Cause No. <br> 53C06-1201-CT-88 |

**Baker, Judge.**

[1] Relying on the Indiana Medical Malpractice Act and precedent from our Supreme Court, we hold that a medical malpractice plaintiff need only present the following to a medical review panel: (1) a proposed complaint that encompasses the theories of malpractice alleged in the subsequent litigation sufficiently to satisfy our notice pleading requirements; and (2) evidence relating to the theories of alleged malpractice that the plaintiff seeks to raise during the subsequent litigation. Additionally, we hold that narrative statements submitted to the panel do not subsequently bind the parties. Because these requirements were met in this case, we affirm the trial court's order and remand for further proceedings.

## Facts[1]

[2] In May 1998, Rowena Turner was diagnosed with a type of bone marrow cancer. Among other things, patients with this type of cancer are at increased risk for blood clots.

[3] In April 2008, Rowena learned that she had malignant tumors in her colon. Therefore, on May 23, 2008, Dr. Charles McKeen performed a surgery to remove a large portion of Rowena's colon. Rowena remained in the hospital until May 29 (the "first hospital stay"), when she was discharged following

---

[1] We held oral argument in Indianapolis on September 13, 2016. We thank counsel for both parties and amici for their truly outstanding appellate advocacy.

post-operative care. Dr. McKeen instructed her not to restart her blood thinner medication.

[4] On the evening of May 31, Rowena returned to the emergency room with a complaint of nausea and vomiting. She was admitted to the hospital that evening (the "second hospital stay") under Dr. McKeen's care. On June 1, Dr. McKeen observed that Rowena's abdomen was distended, and concluded that she had a probable small bowel obstruction. Later that day, Rowena's blood pressure dropped and her heart rate increased. She was transferred to the critical care unit. Eventually, Rowena was diagnosed with deep vein thrombosis[2] and acute renal failure. On the morning of June 13, 2008, Rowena's blood pressure dropped and her heart rate increased. Based on the clinical deterioration, an on-call surgeon performed an exploratory surgery of her abdomen. The surgery revealed that a portion of Rowena's small bowel was dead, and later laboratory tests revealed blood clots in the vessels leading to the small bowel, which obstructed blood flow to that organ. Further treatment did not improve her condition, and Rowena died on June 20, 2008.

[5] On January 15, 2010, Rowena's husband, Billy Turner (Turner), filed a proposed complaint for medical malpractice with the Indiana Department of Insurance. The proposed complaint alleged that Dr. McKeen provided

---

[2] Deep vein thrombosis occurs when a blood clot "forms in one or more of the deep veins in your body, usually in your legs." *Deep Vein Thrombosis (DVT)*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/basics/definition/con-20031922.

Rowena with medical and surgical treatment from May 23, 2008, through June 20, 2008; that the medical and surgical treatment was negligent and below the appropriate standard of care; and that Rowena died as a direct proximate result of the "negligent substandard medical and surgical care" provided by Dr. McKeen. Appellee's App. p. 1-2.

On June 23, 2011, Turner filed his submission to the medical review panel (MRP). Along with the medical evidence and proposed complaint, Turner's attorney submitted a document to the MRP describing the pertinent evidence and discussing the potential issues presented by Dr. McKeen's care of Rowena. Turner stated that "[t]he surgery performed May 23, 2008, was the appropriate surgery. . . . Although she more likely than not was ill-prepared for discharge to home, there will be no discussion as to that decision." Appellant's App. p. 73. With no further discussion of the first hospital stay, Turner moves to the second hospital stay.

In short, Turner argued that exploratory surgery should have been performed "long before" the June 13, 2008, operation: "The standard of care required exploration at that time [June 1 or June 2]. Had the patient been explored in a timely fashion she would have survived." *Id.* at 74. The MRP submission makes no mention of the dosage of anticoagulant medication Dr. McKeen prescribed for Rowena during or immediately following the first hospital stay, nor does it mention his decision to instruct her to forego her blood thinner medication at that time. In Turner's Reply to the MRP Submission, he summarized his contentions as follows:

What a surgeon should be thinking when a patient has acute renal failure is that it is a surgical emergency until proven otherwise. . . . Mrs. Turner was acutely ill from the time that she returned to the hospital on May 31, 2008 with serious and persistent bandemia, nausea, vomiting, altered mental state, hypotension coupled with tachycardia, intra-peritoneal free air, an unusual amount of abdominal fluid shown on CT and a paracentesis which essentially showed a great deal of pus. These things added up to a severe abdominal process that demanded exploration. The delay in re-exploration of this surgical patient was the cause of her continued decline and eventual death.

Appellant's App. p. 85-86. On November 1, 2011, the MRP convened and later issued its opinion: "The panel is of unanimous opinion that the evidence does not support the conclusion that the defendant failed to meet the applicable standard of care, and that his conduct was not a factor of the resultant damages." Appellee's App. p. 4.

On January 13, 2012, Turner filed a complaint against Dr. McKeen in the trial court. A lengthy discovery process took place over the next two years. On February 28, 2014, Turner filed a supplemental expert witness designation, disclosing anticipated opinions from an expert hematologist, Dr. Robert Manges. Dr. Manges was expected to opine that when Dr. McKeen discharged Rowena following the first hospital stay, the anticoagulation medication was inadequate given her high risk for blood clots. Dr. Manges would testify that, had Rowena received proper anticoagulation medication after the first hospital stay, she would not have developed the clots leading to her eventual death.

[9] On March 14, 2014, Dr. McKeen filed a motion to strike Dr. Manges' opinions regarding the first hospital stay because this theory of negligence had not been presented to the MRP. Initially, the trial court granted the motion to strike on April 17, 2014. Turner sought an interlocutory appeal of that decision, which this Court ultimately denied on August 1, 2014. On September 29, 2014, the trial court entered an order notifying the parties that it was open to reconsideration of its ruling on the motion to strike in light of this Court's ruling in *Whitfield v. Wren*, 14 N.E.3d 792 (Ind. Ct. App. 2014). Following argument and briefing, the trial court upheld its original ruling granting the motion to strike. On August 12, 2015, as the parties were in the process of argument related to motions in limine, Turner filed a motion that the trial court again reconsider its ruling on the motion to strike. Following argument, on September 15, 2015, the trial court issued an order denying the motion to strike. In pertinent part, the trial court ruled as follows:

16. . . . Based on the excellent oral argument of both counsel . . . , it is now clear to the Court that the anticoagulation medicine is relevant to blood clotting and Mrs. Turner's overall condition, and the existence and timing of the clots is relevant and inseparably intertwined with the medical malpractice claim.

17. The Court concludes that evidence of the anticoagulation medicine was presented to the medical review panel, and that the prescription of the anticoagulation medicine is so intertwined with the claim that [Dr. McKeen] was negligent in his care of Mrs. Turner post-surgery, that the finder of fact needs to be informed about the prescribing of the anticoagulants historically and throughout [Dr.

McKeen's] treatment of Mrs. Turner. . . . It therefore follows that because the prescription of anticoagulation medicine is so intertwined in the ultimate question of negligence, the experts should not be barred from assessing whether the prescription of the anticoagulants, itself, constituted a breach of the standard of care, and even whether it caused or contributed to the cause of death.

18. Although this Court initially believed that it could and must separate out the claims of breach of standard of care related to prescribing anticoagulation medicine from the breach of standard of care in failing to conduct post-operative surgery or other exploratory measures, the Court now concludes that was error. These alleged breaches are intertwined, and the finder of fact is entitled to hear the expert opinion whether the prescription of anticoagulation medicine met the standard of care as well and whether and how it may affect the reasonableness (standard of care) of the Defendant's post-operative decision-making and medical action or inaction. The evidence of coagulation was before the medical review panel, was within the scope of the panel's deliberations, and the panel had the opportunity to consider it as a factor in its determination, even if [Turner] had not specifically designated to the medical review panel the prescription of the anticoagulation medicine as a separate breach of the standard of care.

Appellant's App. p. 25-27. Dr. McKeen now brings this interlocutory appeal.

## Discussion and Decision

[10]    The decision to admit or exclude evidence lies within the sound discretion of the trial court. *E.g.*, *Morse v. Davis*, 965 N.E.2d 148, 155 (Ind. Ct. App. 2012).

This standard also applies to a trial court's decision to admit or exclude expert testimony. *Id.* We will reverse only if the trial court's decision "is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.*

Dr. McKeen argues that the trial court should have granted his motion to strike the testimony of Dr. Manges insofar as that testimony relates to the prescription (or lack thereof) of anticoagulation medicine to Rowena during and immediately following the first hospital stay. Dr. McKeen contends that because this theory of liability was not presented to the MRP, Turner is prohibited from raising it at this point. Dr. McKeen relies primarily on caselaw in making his argument, although an exploration of relevant statutes is also required.

## I. The Medical Malpractice Act and Narrative Statements

First, we will turn to the Indiana Medical Malpractice Act[3] (the Act) to determine what, precisely, the MRP may consider in reaching its conclusion. Specifically, we must decide whether a narrative statement drafted by the plaintiff's attorney constitutes evidence to be considered by the MRP.

---

[3] Ind. Code art. 34-18.

[13]     The Indiana Medical Malpractice Act[4] (the Act) is in derogation of the common law. *Preferred Prof'l Ins. Co. v. West*, 23 N.E.3d 716, 726-27 (Ind. Ct. App. 2014), *trans. denied*. As such, it must be strictly construed against limitations on a claimant's right to bring suit. *Id.*

[14]     Before a medical malpractice lawsuit may be filed against a healthcare provider, two prerequisites must be met: (1) the claimant must present a proposed complaint to an MRP; and (2) the MRP must give its opinion.[5] Ind. Code § 34-18-8-4. An MRP consists of three healthcare providers and an attorney/chairperson, who acts in an advisory capacity but does not vote. Ind. Code § 34-18-10-3. Within twenty days of the filing of the proposed complaint, either party may request the formation of an MRP. I.C. § 34-18-10-2.

[15]     Upon formation, the MRP chairperson may establish a schedule for "submission of evidence" to the MRP and must allow sufficient time "for the parties to make full and adequate presentation of related facts and authorities." I.C. § 34-18-10-3. Indiana Code section 34-18-10-17(b) elaborates on what may be included in the category: "The evidence may consist of medical charts, x-rays, lab tests, excerpts of treatises, depositions of witnesses including parties, and any other form of evidence allowable by the medical review panel." The MRP's access to information is detailed as follows:

---

[4] Ind. Code art. 34-18.

[5] There are certain limited exceptions to this general rule that are not applicable to the case at hand.

> (a) The panel has the right and duty to request all necessary information.
>
> (b) The panel may consult with medical authorities.
>
> (c) The panel may examine reports of other health care providers necessary to fully inform the panel regarding the issue to be decided.
>
> (d) Both parties shall have full access to any material submitted to the panel.

I.C. § 34-18-10-21.

[16] It is common practice for the parties' attorneys to draft and submit narrative statements to accompany the medical evidence. ITLA Am. Br. p. 3. These statements generally summarize the medical evidence and often point out potential breaches of the standard of care by the defendant(s). *Id.* Nothing in the Act requires the inclusion of such narrative statements.

[17] After receiving and reviewing the evidence, the MRP is then charged with "the sole duty to express the panel's expert opinion as to whether or not *the evidence* supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care *as charged in the complaint*."[6] I.C. § 34-18-10-22(a) (emphases added). Therefore, having reviewed the evidence and

---

[6] The plaintiff would only have filed a proposed, rather than a final, complaint at this point. I.C. § 34-18-8-4.

the proposed complaint, the MRP must form and provide its expert opinion on the matter at hand:

> After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty (30) days, give one (1) or more of the following expert opinions, which must be in writing and signed by the panelists:
>
> (1)    The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
>
> (2)    The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
>
> (3)    There is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury.
>
> (4)    The conduct complained of was or was not a factor of the resultant damages. If so, whether the plaintiff suffered:
>
> > (A)    any disability and the extent and duration of the disability; and
> >
> > (B)    any permanent impairment and the percentage of the impairment.

I.C. § 34-18-10-22(b). The Act does not call for, or permit, the disclosure of the specific reasons underlying the MRP's opinions. *Id.*

[18]     Our Supreme Court, in finding the Act to be constitutional, emphasized that the MRP process is intended to be "informal" and "limited[.]" *Johnson v. St. Vincent Hosp.*, 404 N.E.2d 585, 596 (Ind. 1980), *overruled on other grounds by In re Stephens*, 867 N.E.2d 148 (Ind. 2007). Indeed, the *Johnson* Court noted with approval that "[t]here is little likelihood that appellant will incorrectly estimate the steps that should be taken in procuring and presenting evidence and authorities to the panel, and should he do so, there is little or no risk that he will be harmed thereby." *Id.* at 596.

[19]     We agree with Turner and his amicus, the Indiana Trial Lawyers Association (ITLA), that the plain language of the Act does not require that the submission to the MRP contain specifications of the breaches of standards of care. Furthermore, the narrative statements provided to the MRP by the attorneys do not constitute "evidence." The MRP is only to consider "evidence" and the proposed complaint. To hold, therefore, that a medical malpractice claimant is bound by narrative and argumentative statements made by his attorneys— which the MRP need not consider in rendering its opinion, and which need not be included in the submission at all—is contrary to the plain language of the Act. Nothing in the Act *prohibits* these narrative statements—indeed, they are likely helpful to the MRP and opposing counsel—but nothing in the Act countenances an approach that treats these statements as evidence or as binding legal documents. *See Sherrow v. Gyn, Ltd.*, 745 N.E.2d 880, 885 (Ind. Ct. App. 2001) (finding that legal argument in MRP submissions is inappropriate because, if that were the practice, "parties' evidentiary submissions would

become lengthy legal memoranda in which the parties debate and argue points of law" and that result "would not further the legislature's intent that [MRPs] should operate in an informal manner").

We have concluded, based upon the language and intent of the Act, that the narrative statements commonly included among MRP submissions do not constitute evidence to be considered by the MRP. As noted above, the MRP considers "evidence" and the plaintiff's proposed complaint in reaching an ultimate conclusion. I.C. § 34-18-10-22(a). Therefore, we must next determine what, precisely, must be included in the proposed complaint.

## II. Caselaw and the Proposed Complaint

### A. *Miller*

In *Miller v. Memorial Hospital of South Bend, Inc.*, our Supreme Court considered the effect that the materials provided to an MRP could have on the litigation of a medical malpractice claim. 679 N.E.2d 1329 (Ind. 1997). In *Miller*, the plaintiffs filed medical malpractice claims against a physician and a hospital for injuries that their son suffered before, during, and after the time of his birth. *Id.* at 1330. The proposed complaint filed with the Department of Insurance and final complaint filed with the trial court had "[v]irtually identical language" containing four counts—two against the hospital and two against the doctor— for negligence and breach of contract "on and after June 7, 1982," when their son was born. *Id.* After submitting the claim to an MRP, the plaintiffs filed a lawsuit in the trial court.

[22] Before the trial occurred, the plaintiffs settled their claims against the doctor and received the maximum recovery authorized by the Act. The hospital then sought summary judgment, alleging that the Act prohibits any recovery beyond the statutory maximum for any one injury and that the injuries sustained by the infant as a result of the actions of the doctor and/or hospital are identical. *Id.* at 1331. In response, the plaintiffs asserted that they were seeking recovery for two different sets of injuries: the claims against the hospital were based on the infant's postnatal injuries, whereas the claims against the doctor were based on the infant's prenatal injuries. The hospital argued that because the plaintiffs had never raised the distinction between prenatal and postnatal injuries in their proposed complaint or their submission to the MRP, they were prohibited from making the argument to the trial court. *Id.* The trial court granted the hospital's summary judgment motion, finding that the plaintiffs were barred from alleging separate injuries to the trial court.

[23] In considering the parties' arguments, our Supreme Court focused on the principles of notice pleading. Indiana Trial Rule 8(A) requires only "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for relief to which the pleader deems entitled. . . ." More specifically, "[o]ur notice pleading rules do not require that the complaint state all the elements of a cause of action." *Miller*, 679 N.E.2d at 1332. Instead, a plaintiff need only plead the operative facts involved in the litigation. *Id.*

[24] Our Supreme Court then held, in accordance with the principles of notice pleading, that the plaintiffs' complaint was sufficient to present claims for

separate acts of malpractice by the doctor and by the hospital. With respect to the material submitted to the MRP, our Supreme Court disagreed with the hospital's position:

> We decline to accept Memorial Hospital's argument that the plaintiffs' action is restricted by the substance of the submissions presented to the medical review panel. Pursuant to the statute, the panel was authorized to review the medical records and other submitted material pertaining to each defendant's treatment of [the infant]. *While a medical malpractice plaintiff must, as a prerequisite to filing suit, present the proposed complaint for review and expert opinion by a medical review panel, there is no requirement for such plaintiff to fully explicate and provide the particulars or legal contentions regarding the claim*.

*Id.* at 1332 (emphasis added) (internal citation omitted). Ultimately, our Supreme Court reversed the summary judgment order and remanded the cause for further proceedings. *Id.*

# B. *K.D.* and Progeny

In *K.D. v. Chambers*, a panel of this Court considered a similar issue to that presented in *Miller*. 951 N.E.2d 855 (Ind. Ct. App. 2011), *trans. denied*, *disapproved of on other grounds by Spangler v. Bechtel*, 958 N.E.2d 458 (Ind. 2011). In *K.D.*, the plaintiff filed a medical malpractice claim after a nurse administered an intravenous dose of Benadryl to the plaintiff's son that was ten times the dose he should have received.

The proposed complaint filed with the Department of Insurance alleged two counts. Count I alleged that two treating physicians "were careless and

negligent" in their care of the child, as the child "suffered a Benadryl overdose" and "various other overdoses" while in their care. *Id.* at 858. Count II alleged that the hospital and its employees, including the nurse, "were careless and negligent" in their care and treatment of the child, as he "suffered from multiple overdoses" administered by the defendants. *Id.*

[27] The submission tendered to the MRP, which set forth "issues, facts, and evidence," explained that the issues presented were whether the defendants breached the standard of care in one or more of the following ways: "(1) Failed to give the proper dosage of Benadryl as it was ordered. (2) Failed to question or ensure whether the dosage of Benadryl that she gave was an appropriate dosage for a child who weighed 15 kg." *Id.* at 859. The submission referred to the proposed complaint, "but did not specify any overdoses or breaches of the standard of care other than the overdose of Benadryl." *Id.*

[28] After receiving the opinion from the MRP, the plaintiff filed a complaint in the trial court that was virtually identical to the proposed complaint. In preparation for trial, the plaintiffs filed a proposed jury instruction outlining three claims of breaches of the standard of care: (1) that the child was given ten times more than the recommended dose of Benadryl; (2) that "the rate at which the Benadryl was pushed was a deviation in the standard of care;" and (3) that "the giving of additional central nervous system depressants in the face of [a] specific order to the contrary was a deviation in the standard of care." *Id.* The defendants objected to the instruction and filed a motion in limine seeking to exclude all references to the latter two claimed breaches of the standard of care,

arguing that these alleged breaches had not been presented to the MRP. The trial court granted the motion in limine and the plaintiffs brought an interlocutory appeal of the order.[7]

[29] This Court explained the relevant statutory provisions, largely outlined above in this opinion, and then concluded that,

> [a]s the above statutory provisions show, the question of whether defendants breached the standard of care must be presented to the [MRP] and answered based on the evidence submitted to it. *It logically follows that a malpractice plaintiff cannot present one breach of the standard of care to the panel and, after receiving an opinion, proceed to trial and raise claims of additional, separate breaches of the standard of care that were not presented to the panel and addressed in its opinion.*

*Id.* at 864 (emphasis added). The Court acknowledged that the pleaded allegations contained in the proposed complaint were not "per se insufficient," given notice pleading rules, but the "submission to the Review Panel contained no statement or argument and . . . no evidence of any breaches besides the overdose of Benadryl." *Id.*

[30] This Court then turned to *Miller*, finding it distinguishable:

> As we are addressing a different issue, namely, Plaintiffs' failure to present all claimed breaches of the standard of care to the Review Panel, we do not interpret the above language so broadly as to allow a plaintiff to argue at trial separate breaches of the

---

[7] The plaintiffs also appealed other orders not relevant to the case at hand.

standard of care that were not presented in a submission of evidence to the panel. Whereas the number of occurrences of malpractice and allowable recoveries under the MMA has been treated as a question of law, the factual question of whether the standard of care was breached must be initially addressed and answered by the panel.

*Id.* at 865 (internal citations omitted). In the end, the *K.D.* Court found that, "[b]ecause the giving of additional improper doses was not within the scope of Plaintiffs' submission to the Review Panel, they cannot now raise the same as a separate breach, and in this respect we affirm the trial court's ruling to exclude such evidence." *Id.* The Court reached a different result with respect to the claim that the rate at which the Benadryl was administered was a breach, finding that "[t]he failure to give the proper dosage to a child can encompass both the total amount of the drug administered as well as the rate at which the drug is administered." *Id.* Therefore, this Court reversed the trial court's order to the extent that it excluded evidence regarding the rate at which the Benadryl was administered.

[31] Since *K.D.*, which muddied the post-*Miller* waters, this Court has considered similar issues on at least two occasions. In *Whitfield v. Wren*, 14 N.E.3d 792 (Ind. Ct. App. 2014), this Court noted that *K.D.*'s holding "focused on the fact that the only *evidence* which was submitted to the [MRP] for their consideration concerned the Benadryl overdose." *Id.* at 805 (emphasis added). In *Whitfield*, in contrast, all evidence related to breaches being alleged at trial was submitted to the MRP. Because it can be presumed that the MRP considered the evidence

and possible breaches, this Court concluded that evidence related to new breaches first presented on summary judgment was properly considered by the trial court.

Finally, in *Ball Memorial Hospital, Inc. v. Fair*, 26 N.E.3d 674 (Ind. Ct. App. 2015), this Court acknowledged the plaintiff's argument that *K.D.* directly conflicts with *Miller*. The Court, however, noted that it did not need to rely on *K.D.* to reach its results and it left "the question of *K.D.*'s validity for another day." *Id.* at 680. The *Ball Memorial* Court ignored *K.D.* and focused on *Miller*, emphasizing *Miller*'s reliance on notice pleading and finding that the language of the complaint at issue was broad enough to put the hospital on notice that the possible negligence of any of its staff was at issue. *Id.* at 682.

## C. Synthesizing the Precedent and the Act

It is challenging, to say the least, to synthesize *K.D.* with these other cases. To find our answer, we believe the best approach is to return to our Supreme Court's last guidance on the issue, found in *Miller*. And *Miller* could not be clearer. That case instructs us to focus on the content of the proposed complaint and analyze whether, under principles of notice pleading, that complaint encompasses theories of negligence raised by the plaintiff after the MRP process has concluded. Our Supreme Court clearly and explicitly held that the plaintiff's action is *not* "restricted by the substance of the submissions presented to the [MRP]." *Miller*, 679 N.E.2d at 1332. Indeed, there is no

requirement whatsoever that a plaintiff "fully explicate and provide the particulars or legal contentions regarding the claim" to the MRP. *Id.*

[34] We believe that *Miller* and the Act require two things of a medical malpractice plaintiff seeking to raise new breaches of the standard of care after the MRP process has concluded. First, under the rules of notice pleading, the proposed complaint must encompass the theories regarding breach sought to be raised at trial. Second, "evidence," as defined by the Act, related to the theories must have been submitted to the MRP. If the plaintiff has complied with both of these requirements, then evidence related to the new theories of negligence may be admitted during litigation following the MRP process.[8] To the extent that *K.D.* has been read to require a narrative statement be submitted to the MRP, to bind parties to the content of those narrative statements, or to depart from *Miller* or the plain language of the Act, we believe that it was wrongly decided and/or has been misread.

[35] To depart from these basic guidelines would be to defeat the purposes of the MRP process. It is intended to be informal and limited; it is also intended to

---

[8] At oral argument, a member of this panel raised a concern to the attorneys about the possibility of plaintiffs' attorneys "gaming the system" by intentionally hiding the proverbial football during the MRP process and then ambushing the defendant with new theories at trial. Counsel for the appellees explained that there would be no such incentive because plaintiffs have every incentive to succeed during the MRP process and receive an MRP opinion that would aid them during litigation; therefore, there would be no reason to "hide the ball." We would like to laud counsel for the appellants, who had the opportunity to speak negatively about plaintiffs' lawyers but declined to do so. Instead, he stated that in his twenty-five years of being a medical malpractice attorney, he has never known of a plaintiffs' lawyer who would intentionally game the system in that way. We thank Mr. O'Neill for this moment of professionalism and candor, and hope that attorneys throughout this State will follow his excellent example.

place little to no risk on the participants. If plaintiffs were required to present each and every possible theory of negligence to the MRP, and were bound by those allegations, then plaintiffs would be required to conduct full and complete discovery long before the litigation even began. This would create barriers of expense and time that would be insurmountable for most, if not all, potential plaintiffs, and the cost of the process would also be borne by the defendants. We do not believe that our Legislature intended such a result in creating the MRP process.

## III. Applying the Act and Caselaw

[36] Having outlined the requirements under these circumstances, we must determine whether, in this case, those requirements were met. Turning first to Turner's proposed complaint, we note that it contains the following allegations:

1. The Plaintiff, Bill Turner, is the surviving spouse of Rowena Turner who died on June 20, 2008.

2. Bill Turner and Rowena Turner were married on July 17, 1966 and remained husband and wife until Rowena Turner's death on June 20, 2008.

3. The Defendant, Charles McKeen, M.D., provided the Plaintiff's Decedent, Rowena Turner, with medical and surgical treatment from May 23, 2008 through her death on June 20, 2008.

4. Said medical and surgical treatment was negligent and below the appropriate standard of care.

5. As a direct proximate result of the negligent substandard medical and surgical care rendered to the Plaintiff's Decedent, Rowena Turner, by the Defendant, Charles McKeen, M.D., Rowena Turner died on June 20, 2008.

6. As a direct and proximate result of the Defendant's negligence as described above the Plaintiff, Bill Turner, has lost the care, love, affection and companionship of his wife, Rowena Turner, and has suffered great emotional distress, pain and suffering.

7. Medical, funeral and burial expenses were incurred for Rowena Turner as a direct and proximate result of the Defendant's negligence.

Appellee's App. p. 1-2. Therefore, the proposed complaint encompasses the dates of both the first hospital stay, which began on May 23, 2008, and the second hospital stay, which ended with Rowena's death on June 20, 2008. The proposed complaint also alleges that both the "medical and surgical treatment" provided by Dr. McKeen was negligent and below the standard of care. *Id.* In other words, under our broad principles of notice pleading, the allegations in the proposed complaint readily encompass Turner's theory regarding the anticoagulation medication prescribed to Rowena during and after the first hospital stay.

[37] Next, we must consider the evidence presented to the MRP. It is undisputed that Turner provided the MRP with Rowena's full medical records related to

both the first and second hospital stays.[9]  Therefore, evidence relating to the anticoagulation medication was before the MRP.

[38]  In this case, Turner's proposed complaint encompassed the allegations related to the anticoagulation medication prescribed during and after the first hospital stay.  And evidence related to those allegations was before the MRP.  Consequently, the trial court properly denied Dr. McKeen's motion to strike evidence related to those allegations.

# Conclusion

[39]  The Act requires that the MRP consider two things in reaching its conclusion on a claim of medical malpractice:  (1) the proposed complaint; and (2) the evidence submitted by the plaintiff.  Our Supreme Court has held that so long as, under principles of notice pleading, the proposed complaint encompasses specific allegations regarding the defendant's alleged malpractice that were not explicitly raised to the MRP, those allegations may be raised for the first time during subsequent litigation.  In other words, the plaintiff's narrative at trial need not be identical to his MRP narrative so long as evidence relating to his theories of malpractice was before the panel.

---

[9] Dr. McKeen notes that, when deposing the members of the MRP, Turner did not question the physicians regarding the first hospital stay or the anticoagulation medication, arguing that the failure to do so should prohibit Turner from raising the issues at a later date.  We agree with the ITLA, however, that we are "unaware of any authority for the proposition that a plaintiff's allegations at trial can be limited by what plaintiff's counsel chooses to ask—or not ask—witnesses at a discovery deposition, and Dr. McKeen has cited no such authority."  ITLA Am. Br. p. 9 n.5.  We do not find this to be a relevant consideration.

[40]    To synthesize these two sources of authority, we hold that a plaintiff may raise any theories of alleged malpractice during litigation following the MRP process if (1) the proposed complaint encompasses the theories, and (2) the evidence related to those theories was before the MRP. In this case, those requirements were met, and Turner may therefore raise his theory related to the anticoagulant at this time.

[41]    The judgment of the trial court is affirmed and remanded for further proceedings.

Vaidik, C.J., and Najam, J., concur.