

**FILED**
Aug 09 2018, 9:09 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Nathaniel Lee
Laura R. Crowley
Lee Cossell & Crowley, LLP
Indianapolis, Indiana

ATTORNEYS FOR
APPELLEE DR. SUNDARAM

Michael E. O'Neill
Kelly K. McFadden
O'Neill McFadden & Willett LLP
Schererville, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James E. Shaw, Administrator of the Estate and as Father of Jaymes G. Shaw, deceased, <br> *Appellant,* <br><br> v. <br><br> Chandra Sundaram, M.D., and Kelli Metelues, <br> *Appellees* | August 9, 2018 <br><br> Court of Appeals Case No. 49A02-1710-CT-2470 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Heather A. Welch, Judge <br><br> Trial Court Cause No. 49D01-1311-CT-42340 |

**Baker, Judge.**

[1] James Shaw (Shaw) brings this appeal as father of Jaymes Shaw (Jay) and as administrator of Jay's estate. Jay died following an illness and a surgery, and Shaw filed a medical malpractice action stemming from Jay's death. Following a lengthy discovery period that included the trial court entering two orders to compel and two sanctions awards against Shaw, the parties went to trial. The jury found in favor of Dr. Chandra Sundaram, who performed the surgery. Shaw now appeals, arguing that (1) the trial court made erroneous rulings regarding one of his expert witnesses; and (2) the trial court erroneously granted a motion in limine preventing Shaw from introducing an informed consent claim into the trial. Finding no error, we affirm.

# Facts

### *Jay's Illness and Surgery*

[2] On October 20, 2009, nineteen-year-old Jay arrived at the emergency room with his mother, Kelli Metelues (Kelli). Jay had previously had a kidney transplant and was scheduled for a kidney stent placement to help relieve a blockage in the transplanted kidney. After evaluating Jay's symptoms, hospital personnel admitted him to the hospital with dual diagnoses of pneumonia[1] and acute renal failure. Doctors believed that one of the contributory factors to Jay's acute renal failure was the blockage in his transplanted kidney.

---

[1] An infectious disease specialist later evaluated Jay and concluded that he might also have influenza, so he was also started on Tamiflu.

[3]     A nephrologist evaluated Jay's condition and concluded that the placement of a stent was the best course of action. That doctor asked Dr. Sundaram, a urologist, to place the stent. The plan was discussed with Jay and Kelli. A surgical consent form was signed for a cystoscopy and transplant stent placement to be performed by Dr. Sundaram and his resident. The signature line bears Jay's name and is witnessed by Kelli, whose name also appears on the lines for "Parent, Guardian, or Other Signature" and for "Name of Adult Witness." Appellant's App. Vol. VI p. 150. The document is also signed in the box labeled "Treating Practitioner," which describes the information provided during the informed consent discussion with the patient and his family, including the risks, benefits, and alternatives to the procedure. Kelli later attested in a deposition that she signed the form on Jay's behalf at his request:

> Q:    At the time, I believe Jay was 19?
>
> A:    Yes.
>
> Q:    Why did you sign this instead of him?
>
> A:    Because I was his caregiver, and he didn't understand what was going on.
>
> Q:    Okay. Were you—did you have documentation that you were his legal representative?
>
> A:    I believe so. I don't remember.
>
> Q:    Okay. So you had a power of attorney or something of that nature?
>
> A:    I actually don't remember. I know he gave consent to sign for him.

Appellant's App. Vol. II p. 141.

[4]    On October 21, 2009, Dr. Sundaram performed a cystoscopy and stent placement on Jay. During the procedure, Jay went into cardiac arrest and died.

### *The Litigation*

[5]    On October 20, 2011, Shaw filed a medical malpractice action against Dr. Sundaram and others with the Indiana Department of Insurance (IDOI). Shaw's proposed complaint included the following allegations:

> 6.    [Jay] presented to the Emergency Room at I.U. Health University Hospital on October 20, 2009 with flu-like symptoms which included fever, chills, cough, weakness, fatigue and diarrhea.
>
> 7.    [Jay] was scheduled for elective surgery for a ureteral stent placement on October 21, 2009.
>
> 8.    Defendants determined that the non-emergent surgery should proceed despite his presentation instead of postponing the surgery.
>
> 9.    [Jay's] condition deteriorated in the Operative Room leading to cardiac arrest and his expiration.
>
> 10.    Defendants failed to act within the reasonable standard of care and as a direct and proximate result of their actions, Plaintiff has been injured.

*Id.* at 189-90.

[6] Shaw eventually presented his claims to a Medical Review Panel (MRP), which found in favor of Dr. Sundaram and the other defendants. On November 21, 2013, Shaw filed a negligence action against Dr. Sundaram on behalf of Jay's estate.[2] In relevant part, the complaint repeats the allegations quoted above, merely changing the plural "defendants" to refer solely to Dr. Sundaram. *Id.* at 73. The complaint states that its purpose is "to redress acts, conduct, omissions, negligence and medical malpractice committed by [Dr. Sundaram[.]]" *Id.* at 72.

### *Expert-Related Discovery Issues*

[7] The discovery process was fraught with conflict largely caused by Shaw. On July 2, 2014, the trial court entered a proposed case management order. The order set a trial date of January 11, 2016,[3] and ordered the parties to, among other things, provide a final witness and exhibit list no later than sixty days before trial. The order further required Shaw to file all expert disclosures no later than 120 days before trial (September 15, 2015). The proverbial wheels came off following this order.

- On September 11, 2015, Shaw preliminarily identified two experts by name only. No disclosure of the opinions of the experts was provided[4]

---

[2] Pursuant to Indiana law on wrongful death actions filed by parents, Kelli was named as a defendant. Ind. Code § 34-23-2-1.

[3] The initial case management order set an earlier trial date, but the trial was later reset for January 11, 2016.

[4] In November 2011, Dr. Sundaram had propounded interrogatories asking, among other things, that Shaw identify each person expected to testify as an expert witness, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a

and Shaw requested an extension of time to name additional experts. The trial court extended the deadline to September 30, 2015, over Dr. Sundaram's objection.

- On September 30, 2015, Shaw provided a supplemental preliminary expert disclosure. This disclosure named, in relevant part, Dr. Joye Carter, and stated only that "[i]t is anticipated that Joye Carter, M.D. will testify as to cause of death[.]" *Id.* at 213.

- On November 5, 2015, Dr. Sundaram filed a motion to compel based upon Shaw's failure to respond to discovery requests regarding expert witnesses.

- On November 10, 2015, Shaw filed his final witness and exhibit list, naming four doctors, including Dr. Carter, as experts.

- Dr. Sundaram moved to continue the trial based on Shaw's failure to properly and timely disclose his expert witnesses and their opinions. On January 4, 2016, the trial court granted the motion to compel, ordering Shaw to respond to Dr. Sundaram's outstanding expert discovery by January 29, 2016. The trial court also reset the trial date to April 17, 2017. The trial court did not extend the expert disclosure deadlines based on the new trial date because both parties assured the court that no one needed additional time for expert disclosures. *Id.* at 37.

- On January 29, 2016, Shaw sent supplemental responses to Dr. Sundaram's discovery requests that still failed to provide any information about his experts' opinions.

- Thereafter, Dr. Sundaram filed a second motion to compel, which the trial court granted, ordering Shaw to answer discovery by May 9, 2016. The trial court also awarded monetary sanctions to Dr. Sundaram based on Shaw's dilatory discovery practice.

- Following the second motion to compel, Shaw finally provided substantive answers regarding his experts' opinions. As to each of the disclosed experts, their opinions dealt only with the alleged breach of the

---

summary of the grounds for each opinion. Appellant's App. Vol. IV p. 142-56; *see also* Ind. Trial Rule 26(B)(4)(a)(i).

standard of care related to Dr. Sundaram's decision to perform the surgery. No expert opinions related to informed consent were disclosed.

[8] On September 19, 2016, Shaw served a supplemental final witness list. For the first time, Dr. Allen Griggs appeared on the list. Dr. Sundaram's counsel responded to Shaw's counsel in a letter, noting that this was the first inclusion of Dr. Griggs, that it was long past the deadline for disclosure of experts, and that Shaw had provided no information regarding Dr. Griggs's opinions. Shaw did not respond. Dr. Sundaram's counsel wrote another letter two weeks later, noting that the objection to Dr. Griggs still stood and asking that if Shaw intended to use Dr. Griggs at trial to please inform Dr. Sundaram immediately. Shaw did not respond.

[9] In January 2017, Shaw began losing confidence that Dr. Carter would be willing and/or able to testify as an expert witness because of difficulties communicating with her. Therefore, he began focusing more attention on Dr. Griggs, who would give substantially similar testimony.

[10] On February 24, 2017, Shaw served supplemental answers to interrogatories, which, for the first time, included cause of death opinions of Dr. Griggs. On February 28, 2017, Shaw moved the trial court to permit him to substitute Dr. Griggs for Dr. Carter, or alternatively, to extend the expert disclosure deadline, explaining that he had had significant difficulty contacting and communicating with Dr. Carter, who had moved out of state. On March 15, 2017, the trial court denied Shaw's motion to substitute and barred Dr. Griggs from testifying, stating as follows:

The Court finds it would be highly prejudicial to permit the Plaintiff to substitute Dr. Griggs as an expert witness for Dr. Carter just 47 days before a two week jury trial. The Plaintiff has had many previous opportunities to disclose its expert witnesses and that deadline has long expired. The Court further finds it would be highly prejudicial to the Defendant to extend the expert deadline as the two week jury trial starts on April 17, 2017 in 41[5] days.

Appellant's App. Vol. V p. 53.

[11] At the March 20, 2017, final pretrial conference, Shaw's difficulty communicating with Dr. Carter came up again. Shaw's counsel and the trial court had the following discussion:

Court:      . . . You can find [Dr. Carter] because she was—I swear she was here. I—my court reporter will tell you what day. . . .

Counsel:   Well, we'll—we'll track her down [be]cause we had sent her . . . I sent her some correspondence and she didn't respond. But I can track her down but it—the point is that her testimony was anticipated to last about an hour on the cause of death. And from an economic standpoint if she's not out of state that's 2 days for her to be here so it goes about a $2500 expense to about a 15 to 20,000 expense . . . .

---

[5] The trial court's order states at one point that it is forty-seven days before trial and at another point that it is forty-one days before trial.

Court:      Well . . . we've had experts—we had one in that trial that testified by . . . video live.

Counsel:    Well we may—we may try to do something like that then.

Court:      You talk to [the court reporter].  She can make sure that happens.

Counsel:    That solves our problem then. . . .

Appellee's Br. p. 16-17.[6]

[12]    On April 12, 2017, Shaw filed another motion requesting that the trial court allow him to substitute Dr. Griggs for Dr. Carter or, alternatively, that the trial be continued.  The trial court denied the motion, emphasizing that at the final pretrial conference, "the attorneys for the parties said they were ready to proceed to jury trial on a case scheduled for 2 weeks."  Appellant's App. Vol. II p. 21.  The same day, the trial court issued a second sanctions order awarding sanctions to Dr. Sundaram for Shaw's discovery practice, noting that "the Plaintiff's counsel has on multiple occasions failed to comply with the trial rules and orders of this court."  Appellee's App. Vol. V p. 173.

[13]    On April 13, 2017, the trial court notified the parties that Dr. Carter had contacted the court and would be able to testify for Shaw on April 20, 2017, via

---

[6] We were not able to find the transcript of this hearing in the record on appeal.

video conference. On April 17, 2017, the first day of trial, counsel for Shaw stated that he reserved the right to call Dr. Griggs as a rebuttal witness and did not plan to call Dr. Carter—even though she was available to testify via video conference. Counsel stated that "we determined that it would cause more of a prejudice to our case if we were to call that witness than benefit. So therefore, we had to withdraw that particular witness." Tr. Vol. II p. 7. Counsel did not ask during trial that Dr. Griggs be permitted to testify as a primary expert witness, nor did counsel make an offer of proof regarding what the testimony would have been.

[14] Shaw's counsel later requested to call Dr. Griggs as a rebuttal witness. Tr. Vol. VI p. 223-24. Counsel stated that he planned to use Dr. Griggs to rebut Dr. Sundaram's testimony regarding what level of creatinine is fatal.[7] *Id.* Counsel explained that "this was unanticipated evidence by a witness" and that "it's a very narrow reason that we want to offer a rebuttal testimony [in] that regard[.]" Tr. Vol. VII p. 63. Dr. Sundaram's counsel objected, noting that "[t]his is the third or fourth time they've tried to back door Dr. Griggs into— into this trial." *Id.* at 69.

---

[7] After Dr. Sundaram testified, a juror asked Dr. Sundaram, "What level number of creatinine is fatal in a patient?" Tr. Vol VI p. 93-94. Dr. Sundaram's response is the testimony Shaw intended Dr. Griggs to rebut. Neither attorney objected to the question or the answer, though the trial court later indicated it would have sustained such an objection had one been made. Tr. Vol. VII p. 79 ("I can guarantee you if either party would have objected to this question, I would not have permitted it.").

[15]    The trial court denied the request to call Dr. Griggs as a witness, noting that known and anticipated witnesses, even if presented in rebuttal, must be identified pursuant to a court order or to a proper discovery request. *Id.* at 76. The trial court went through the lengthy discovery history of the litigation, noting the many hard and clear deadlines that had been put in place throughout the proceedings and the many extensions of those deadlines it had afforded to Shaw. The trial court observed that

> we've been over this and over this and I feel like it is a run around the Court's prior order which I issued on March the 15th, not permitting Dr. Griggs['s] testimony. I don't know what the issues are with Dr. Carter and you, [counsel for Shaw]. . . . So, I'm denying the request for Dr. Griggs to testify. He's not an unanticipated rebuttal witness.

*Id.* at 82-83. Although afforded the opportunity to do so, Shaw did not make an offer of proof regarding Dr. Griggs's testimony.

### *Motion in Limine Regarding Informed Consent*

[16]    On March 13, 2017, Dr. Sundaram filed multiple motions in limine. Relevant to this case is Motion in Limine B, which sought to bar any new claim not submitted to the MRP, including any undisclosed claim regarding informed consent. At the March 20, 2017, final pretrial conference, the trial court noted that Shaw had not designated any expert opinion or evidence related to the issue of informed consent:

> [The cases are] all clear that you—you have to—you have to put on notice that one of the issues—you don't have to go into detail.

> It's [sic] doesn't have to be formal or anything. But—you
> know—there's lack of informed consent. But that was not heard
> by the medical review panel. Because you have to have expert
> testimony on that issue.

Appellee's Br. p. 16. The trial court took the issue under advisement and later issued a lengthy order granting Motion in Limine B. It explored relevant caselaw and noted that a claim of informed consent is separate and apart from a claim of medical negligence. The court reviewed Shaw's complaints filed with the IDOI and the trial court, discovery responses, and submissions to the MRP, and found that Shaw had

> never made any mention that the issue of lack of informed
> consent was something the MRP should consider when
> determining if there was practice below the standard of care. . . .
> This Court finds that the operative facts plead could not lead one
> to possibly infer that Plaintiffs were alleging a claim of lack of
> informed consent.

Appellee's App. Vol. IV p. 146.

[17] At the trial, Shaw's counsel asked Kelli questions regarding informed consent. Dr. Sundaram objected and the trial court sustained the objection. Shaw did not make an offer of proof. Following the close of evidence, the parties and the trial court discussed the final jury instructions. The parties agreed that the following instruction could be given to the jury:

> Throughout the course of this trial, you have heard evidence
> regarding informed consent for the treatment Dr. Sundaram
> provided to [Jay] and you have heard evidence regarding

decisions of the medical team. You are instructed that informed consent and the negligence of other members of the medical team are not issues to be decided in this case. Therefore, you should not consider this in your deliberations.

Tr. Vol. VII p. 96-97.

[18] On April 25, 2017, the jury found in favor of Dr. Sundaram and the trial court entered judgment in his favor. Shaw later filed a motion to correct error, which the trial court denied in relevant part in a thirty-eight-page order. Shaw now appeals.

# Discussion and Decision

## I. Dr. Griggs

[19] Shaw first argues that the trial court erred in two respects related to Dr. Griggs: (1) by denying his request to substitute Dr. Griggs for Dr. Carter as a primary expert witness; and (2) by denying his request to call Dr. Griggs as a rebuttal expert witness. The decision to admit or exclude evidence, including expert testimony, is a matter within the discretion of the trial court. *Horn v. Jara*, 63 N.E.3d 1, 3 (Ind. Ct. App. 2016), *trans. denied*. We will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* Even if the trial court's ruling is erroneous, we will reverse only if the error is inconsistent with substantial justice. *Id.* To determine whether this test is met, we must assess the probable

impact upon the trier of fact. *Linton v. Davis*, 887 N.E.2d 960, 965-66 (Ind. Ct. App. 2008).

## A. Substitution for Dr. Carter

Shaw argues that the trial court should have permitted him to substitute Dr. Griggs for Dr. Carter as a primary expert witness after he began experiencing communication difficulties with Dr. Carter.

In the trial court's order denying Shaw's motion to correct error, it first went through the lengthy history of Shaw's dilatory discovery practice, which included *two* orders to compel and *two* sanctions awards to Dr. Sundaram. It then explained that it would not condone Shaw's tardy attempts to proffer Dr. Griggs as a substitute witness for Dr. Carter:

> The Plaintiff's attorney had many opportunities from November of 2013 when the complaint was filed until May 9, 2016 to disclose his expert witnesses and their opinions. In this case, the Plaintiff's counsel did not disclose or inform the Court or Defendant's counsel until September 19, 2016 he might want to use Dr. Griggs but never provided Dr. Grigg's opinions until 47 days before the jury trial. In addition, he wanted Dr. Griggs to testify instead of Dr. Carter. At first, Plaintiff's counsel informed the Court he could not locate Dr. Carter then the Court informed the Plaintiff's counsel that Dr. Carter had testified in this Court in January of 2017. Then Plaintiff's counsel said he did not want to incur the costs to transport Dr. Carter from Texas to Indiana and the Court permitted her to testify via video conferencing over the Defendant's objection. Ultimately, the Plaintiff's counsel elected not to call Dr. Carter in his case to testify as to the cause of death.

> During this case, the Court was merely trying to ensure both parties would receive a fair trial and attempting to require that the Plaintiff's counsel comply with the discovery deadlines in this case. . . . This Court provided Plaintiff's counsel three extensions of time beginning on September 11, 2015 through May 9, 2016 to disclosure [sic] his expert witnesses and their opinions. . . . This Court has acted fairly and provided Plaintiff's counsel ample opportunity to disclose his expert witnesses and their opinions. This Court was required to enforce the deadlines set to insure the litigants both received a fair trial.

Appellant's App. Vol. II p. 60-62.

[22] In reviewing the order, it is apparent that the trial court was not only frustrated with counsel for Shaw for his discovery tactics but also questioned counsel's credibility. We decline to second-guess the trial court's assessment in this regard.

[23] In any event, Shaw first listed Dr. Griggs as an expert witness in September 2016—months before he began experiencing the alleged communication problems with Dr. Carter. As the expert disclosure deadline had come and gone a year earlier on September 30, 2015, the untimely disclosure of Dr. Griggs was a problem to begin with.[8] The trial court evidently concluded that

---

[8] Shaw argues that the July 2, 2014, case management order permitted him to file expert disclosures no later than 120 days before trial, and that the deadline was later moved to 90 days before trial as part of a January 4, 2016, pretrial order. What he neglects to recognize, however, is that at the pretrial conference precipitating the January 4, 2016, order, the trial court "was provided assurances from both attorneys that no one needed additional time for expert disclosures. The attorneys agreed they had the experts they needed, so the Court did not need to extend the expert disclosure deadlines based on the new trial date." Appellant's App. Vol. II p. 37. In other words, the expert disclosure deadline *was never extended beyond September 30, 2015*. Shaw does

Shaw's later attempt to substitute Dr. Griggs for Dr. Carter was an improper attempt to bootstrap an untimely-disclosed witness into the trial, and we decline to second-guess that conclusion.

Given the lengthy history of discovery violations by Shaw, we find that the trial court acted within its discretion to deny Shaw's request to substitute Dr. Griggs for Dr. Carter as a primary expert witness. We also note that even if we had found the decision erroneous, we would have no way of determining whether the error was reversible or not as Shaw did not make an offer of proof regarding what Dr. Griggs's testimony would have been; consequently, we could not evaluate its probable impact on the jury. In all respects, therefore, this argument is unavailing.

## B. Dr. Griggs as Rebuttal Witness

Next, Shaw argues that even if the trial court did not err by refusing to permit Dr. Griggs to testify as part of Shaw's case-in-chief, it should have permitted the physician to testify as a rebuttal witness.

Our Supreme Court has squarely held that "the nondisclosure of a rebuttal witness is excused only when that witness was unknown and unanticipated; *known and anticipated witnesses, even if presented in rebuttal*, must be identified pursuant to a court order, such as a pre-trial order, or to a proper discovery

not dispute the trial court's recitation of events, though he does contend that the deadline was implicitly extended. We disagree.

request." *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 179 (Ind. 1993) (emphasis added). Here, Dr. Griggs was obviously both known and anticipated, as Shaw spent a great deal of time and effort attempting to have him testify as part of Shaw's case-in-chief. Therefore, Shaw's failure to timely identify both Dr. Griggs and his opinions pursuant to the trial court's case management order and Dr. Sundaram's discovery requests prevented his ability to call Dr. Griggs as a rebuttal witness. The trial court did not err by denying this request.

[27] Furthermore, yet again Shaw did not make an offer of proof regarding what Dr. Griggs's rebuttal testimony would have been. We therefore have no way of evaluating what the probable impact of that testimony would have been on the jury. Shaw is not entitled to relief on this basis.

## II. Informed Consent

[28] Shaw also argues that the trial court erroneously granted Dr. Sundaram's motion in limine, thereby preventing Shaw from litigating any claim related to informed consent. As above, the decision to admit or exclude evidence is within the trial court's sound discretion, and we will reverse only if the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Hora*, 63 N.E.3d at 3.

[29] In *McKeen v. Turner*, our Supreme Court approved of this Court's holding that "'a plaintiff may raise any theories of alleged malpractice during litigation

following the MRP process if (1) the proposed complaint encompasses the theories, and (2) the evidence relating to those theories was before the MRP.'" 71 N.E.3d 833, 833 (Ind. 2017) (quoting *McKeen v. Turner*, 61 N.E.3d 1251, 1262 (Ind. Ct. App. 2016)). The parties spend a great deal of time arguing about whether Shaw's informed consent claim meets this test, but we need not address that issue and will assume solely for argument's sake that the informed consent claim meets the *McKeen* test.

[30] It is well settled that expert testimony is required to establish whether a physician has or has not complied with the standard of a reasonably prudent physician with respect to informed consent. *Culbertson v. Mernitz*, 602 N.E.2d 98, 103-04 (Ind. 1992). As exhaustively set forth herein, the discovery process in this case stretched out for years. Shaw ended up naming five expert witnesses, including Dr. Griggs. When Shaw finally elected to comply with the trial court's discovery orders by explaining the opinions each of his experts would testify to and the general bases therefor, *not once* did he state that any of his experts would testify regarding informed consent. Injecting the issue of informed consent into the case at the eleventh hour, having given Dr. Sundaram no indication whatsoever that it would be addressed by any of the experts, would have been improper even if the *McKeen* test had been met. Under these circumstances, the trial court did not err by granting the motion in limine.

[31] Moreover, at no point during the trial did Shaw make any offers of proof regarding an informed consent claim. *See Spar v. Cha*, 907 N.E.2d 974, 979-80

(Ind. 2009) (a successful informed consent claim requires proof of nondisclosure of required information, actual damage resulting from the risks of which the patient was not informed, that the patient would have rejected the medical treatment had he known the risk, and that reasonable persons if properly informed would have rejected the proposed treatment); *see also Miller v. State*, 716 N.E.2d 367, 370 (Ind. 1999) (holding that to preserve an error in a ruling on a motion in limine for appellate review, a party must do more than challenge the ruling itself; the party must offer the evidence at trial to give the trial court an opportunity to rule on its admissibility at that time). Shaw failed to make an offer of proof as to what information was not disclosed, what damages resulted from the risks of which the patient was not informed, and whether Jay would have rejected the medical treatment had he known the risk. He also failed to make an offer of proof as to expert testimony regarding what a reasonably prudent physician should tell a patient for a proper informed consent. At the close of the evidence, the trial court gave the parties the opportunity to make a record on any issue they desired. Shaw declined.[9] Therefore, our ability to review this claim is substantially limited, if not nonexistent. Shaw is not entitled to relief on this basis.

---

[9] We also note that Shaw *agreed* to a final jury instruction explicitly removing the issue of informed consent from consideration.

[32]     The judgment of the trial court is affirmed.

May, J., and Robb, J., concur.